IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANTONIO G. RAMIREZ,

                              Petitioner,

      v.

LIZZIE TEGELS,

                            Respondent.

OPINION and ORDER

14-cv-802-jdp

---

Petitioner Antonio G. Ramirez was convicted, after a jury trial, of two counts of first-degree sexual assault of a child, first-degree sexual assault causing great bodily harm, and child enticement in Kenosha County Case No. 1999CF950. The child victim did not testify at Ramirez's trial, but police officers and hospital personnel testified about statements made by the child, the child's mother, and the child's brother. Ramirez's lawyer objected on hearsay grounds, but the lawyer did not argue expressly that the out-of-court statements violated Ramirez's right under the Sixth Amendment's Confrontation Clause to cross-examine adverse witnesses. Ramirez's postconviction and appellate counsel likewise did not raise Confrontation Clause arguments.

Ramirez now seeks a writ of habeas corpus under 28 U.S.C. § 2254. In an earlier opinion, I dismissed three of Ramirez's arguments, but concluded that the Wisconsin Court of Appeals applied federal law unreasonably when it analyzed Ramirez's claim that postconviction and appellate counsel should have raised a confrontation argument under *Crawford v. Washington*, 541 U.S. 36 (2004). I directed the state to file a brief addressing the merits of Ramirez's *Crawford* claim, and I appointed counsel to represent Ramirez for the remainder of this case. The parties have submitted briefing and the matter is now ready for a decision.

Because I conclude that postconviction and appellate counsel provided ineffective representation to Ramirez, I will grant Ramirez's petition. The state must either release Ramirez from custody or grant him a new appeal in which he will have the opportunity to advance the Confrontation Clause arguments that his appellate counsel should have raised.

## BACKGROUND

The following facts are taken from the petition and the state court records provided by Ramirez and the state. Additional background facts were included in the court's November 29, 2018 opinion and order, Dkt. 32.

### A. Arrest and charges

Petitioner Antonio G. Ramirez was arrested on September 5, 1999, after his wife, Cynthia Ramirez, reported to the police that Ramirez had assaulted her and that she believed Ramirez had sexually assaulted her eight-year-old daughter, Ramirez's stepdaughter. The child, M.R., later told a police officer that when her mother left the house that evening, Ramirez told her to go into her bedroom, that he removed her shorts and underwear, and that he touched her with his penis. M.R. also revealed that a vaginal injury that had been surgically repaired in November 1998 was not a bathtub accident, as she originally reported, but that Ramirez had caused it.

For the November 1998 assault, Ramirez was charged with first-degree sexual assault of a child under the age of 13 by a person responsible for the child's welfare and first-degree sexual assault causing great bodily harm. For the September 1999 assault and domestic fight that followed, he was charged with child enticement, first-degree sexual assault of a child under the age of 13 by a person responsible for her welfare, intentionally causing harm to a child

(based on allegations that Ramirez attacked his five-year-old son), battery and false imprisonment (based on allegations that Ramirez physically assaulted and restrained Cynthia), and resisting or obstructing an officer. Ramirez pleaded not guilty and proceeded to a jury trial.

## B. Trial evidence

At trial, the reporting police officer, George Larsen, testified that he had been dispatched to the home of Ramirez's mother-in-law on the night of the assault in September 1999, and that Ramirez's wife Cynthia had told him that she believed her daughter had been sexually assaulted by Ramirez. Dkt. 14-27 at 126–27. Officer Larsen testified that Cynthia was "very emotional, sad, crying, [and] concerned," *id.*, explained that she had returned home and found that "the door was locked with a chain which was not normal," and that she "had to force the back door open." *Id.* at 127–28. Upon entering, "she saw [Ramirez] coming out of [M.R.'s] bedroom pulling up his shorts" and "also saw [M.R.] sitting on the toilet [with] a look on her face." *Id.* Cynthia also told Officer Larsen that Ramirez had bit her on the shoulder, pushed her, and refused to let her leave, and that her son reported seeing Ramirez with M.R. on her bed. *Id.* at 128. Officer Larsen determined a sexual-assault evaluation was needed, so he took Cynthia and M.R. to the hospital. *Id.* at 130. At the hospital, Cynthia and M.R. met with a nurse, Donna Karpowicz-Halpin, along with Officer Larsen. M.R. described to Nurse Karpowicz-Halpin and Officer Larson what had happened, including that Ramirez had "put her face down on the bed" and "put his private by her pooh-pooh." *Id.* Officer Larson testified that M.R. pointed to parts on a teddy bear to indicate where Ramirez had touched her. *Id.* at 132. Officer Larsen remained in the examination room until M.R. had to get undressed. *Id.* at 132–33.

Nurse Karpowicz-Halpin also testified at trial, describing M.R. as being "very distraught," "scared," and "very, very frightened." Dkt. 14-25 at 99. The nurse began her examination of M.R. by asking M.R. if she was in pain, listening to her lungs, looking in her mouth, and asking about school, "just to build a rapport." *Id.* at 104. Then Nurse Karpowicz-Halpin asked M.R. what had happened. M.R. responded that Ramirez had "taken off her pants and [then] took off his pants, and she was laying on her belly on the bed." *Id.* at 105. M.R. also said that Ramirez "put his pee-pee by her butt . . . like on top of her." *Id.* After that, M.R. went to the bathroom and wiped herself with some tissue and threw it in the wastepaper basket. *Id.* at 105–06. Nurse Karpowicz-Halpin also testified that M.R. told her that Ramirez had caused her previous vaginal injury, but that she had not told anyone because Ramirez had threatened to hurt her little brother, mother, or grandmother if she did. *Id.* at 107–08. M.R. stated that Ramirez had injured her by "trying to put his pee-pee inside of her." *Id.* at 107. Nurse Karpowicz-Halpin testified that Cynthia reacted to M.R.'s statements by "crying," and "[h]ugging" the child and encouraging her to "tell [them] the truth." *Id.* at 105. Immediately after the sexual-assault examination, Nurse Karpowicz-Halpin gave police officers a statement recounting what M.R. had told her.

An emergency room doctor, Suzanne Siegal, also testified. Dr. Siegal examined M.R. with both Nurse Karpowicz-Halpin and Cynthia Ramirez in the room. Dr. Siegel stated that M.R. did not have any physical injuries, but that M.R.'s vaginal area was red and irritated and had an abnormal discharge. Dkt. 14-27 at 24. Siegel also testified that when she put a blue lamp on M.R.'s leg, it lit up, indicating that there were "seminal fluids" present. *Id.* Siegel took swabs from M.R.'s vaginal and rectal areas that were sent to the hospital's laboratory. *Id.* at 25. Siegel also placed M.R.'s clothing and swabs from her body into a "rape kit" that was sent to

the state crime lab. *Id.* at 33. Siegel testified that when she asked M.R. what had happened, M.R. responded that Ramirez "had put his pee-pee" by her buttock area. *Id.* at 23. Siegel reviewed the medical records from M.R.'s November 1998 hospital visit and concluded that the injuries described in the records were consistent with sexual abuse. Siegel noted that the records indicated that M.R. had arrived with "an episiotomy like laceration" that had to be surgically repaired, and that such an injury was most consistent with sexual misuse or childbirth. *Id.* at 26.

The state called three doctors to testify about the November 1998 incident. Dr. Michael Schellpfeffer, the surgeon who performed the surgical repair of M.R.'s vaginal injury in November 1998, testified that the child's injuries were "certainly consistent possibly with a penetrating injury." Dkt. 14-7 at 144. But Cynthia had told hospital staff that M.R. was injured in the bathtub. *Id.* at 146. The hospital had checked for seminal material and did not find any. *Id.* at 160. Dr. Schellpfeffer testified that the injury was "not at all typical" of straddle injuries he had seen before, but because Cynthia had told him that she did not know of any sexual abuse, the surgeon wrote in his notes that M.R. had suffered a "perineal laceration from straddle injury." *Id.* at 145, 148, 152.

Two additional doctors provided expert testimony about the November 1998 injury, stating that although the injury had been diagnosed as a "straddle injury" and no sexual abuse report had been made, the injury was "inconsistent with a straddle injury" and was more consistent with sexual abuse. Dkt. 14-26 at 126–27. Both stated that "theoretically," the injuries could have non-assaultive causes. *Id.*; Dkt. 14-27 at 26, 32–38.

Another police officer, Detective John Gregory, testified that he interviewed Cynthia Rameriz later in the evening of September 5, 1999, and that she described breaking the chain

link to get into her home, finding Ramirez coming out of M.R.'s bedroom pulling up his shorts, and seeing M.R. in the bathroom. Dkt. 14-27 at 163–64. The next day, he obtained a statement from M.R. that was consistent with M.R.'s statements to Officer Larsen and hospital staff. *Id.* at 168. Gregory's report of his conversation with M.R. was introduced into evidence. *Id.* Gregory relied on the statement to testify that M.R. had told him that Ramirez had taken off her clothes, lied her down on the bed, and rubbed his penis against her. *Id.* at 174–75. The detective also testified that the child's brother told him that he saw his father take off his shorts and saw "white boogers on the bed." *Id.* at 178–79. (Officers who collected evidence at the house did not find seminal material on the bed. Dkt. 14-25 at 149.)

Another police officer testified that while Cynthia and M.R. were at the hospital, the officer went to their apartment to gather evidence. Dkt. 14-25 at 142. The officer took pictures of the apartment, including a broken latch on the door, and he recovered toilet paper from the bathroom trash can. *Id.* The photographs and the toilet paper were admitted into evidence. *Id.* at 8–9. The state introduced DNA evidence through the testimony of a crime lab forensic scientist, who testified that M.R.'s underwear and toilet paper had sperm cells, semen, or both. The forensic scientist testified that there was a one in 20 trillion chance that the DNA recovered from the tissues and on the underwear belonged to a Hispanic male other than Ramirez, and a one in 400,000 chance that the DNA found on the vaginal swab belonged to a Hispanic male other than Ramirez. Dkt. 14-26 at 107–10.

The state also called Cynthia as a witness. During her testimony, Cynthia recanted all of her previous statements against Ramirez. She testified that she had lied to the police about seeing Ramirez pulling up his shorts at the door to her daughter's room and had told her daughter to lie about being sexually assaulted. She also testified that she had lied about being

attacked by Ramirez and had lied about her son being attacked. Dkt. 14-26 at 51–78. She stated that she had made up the entire incident and had coached her children to lie because she was angry at Ramirez for excessive drinking and being unfaithful, and that she wanted him to go to prison. *Id.* at 65–68; Dkt. 14-27 at 98. Cynthia testified that she and Ramirez had sex on the morning of the incident, with a condom, and threw the used condom in the garbage, but she denied using the condom to plant DNA on M.R. Dkt. 14-27 at 98, 114. When asked about her statement to Detective Gregory that her daughter said during the medical exam that Ramierz had caused the November 1998 injury, Cynthia said, "We never talked about that." *Id.* at 155–56. The court permitted the prosecution to introduce previous statements that Cynthia had made to the police and hospital staff to impeach her trial testimony. Dkt. 14-25 at 9–10.

Cynthia did not bring M.R. to court the morning of trial despite a subpoena ordering her to do so. Dkt. 14-25 at 11. M.R. apparently wrote a letter to the state court recanting her accusations against Ramirez. Dkt. 14-25 at 175. M.R. did not testify at trial and her written recantation was not admitted as evidence.

Defense counsel called Ramirez's brother, who had lived with Ramirez and his family in September 1999. The brother testified that when he returned home on the date of the September 1999 incident, Ramirez was passed-out drunk, the children were watching television, and Cynthia was in the kitchen with "an attitude." Dkt. 14-28 at 106.

The jury found Ramirez guilty of the two counts of sexual assault and one count of child enticement, but the jury found him not guilty of the domestic assault charges and the charge relating to the alleged assault on his five-year-old son. Ramirez was sentenced to two concurrent

40-year prison terms on two of the sexual assault charges, 30 years of probation on the other sexual assault charge, and a consecutive 10-year sentence on the child enticement charge.

## C. Postconviction and appellate litigation in state court

The state public defender appointed counsel to handle Ramirez's appeal. Appellate counsel filed a no-merit brief under Wis. Stat. § 809.32, which is Wisconsin's procedure for implementing *Anders v. California*, 386 U.S. 738 (1967). The Wisconsin Court of Appeals rejected the no-merit brief and remanded the case after counsel failed to file a supplemental report. Dkts. 27-1 and 27-2.

While the no-merit proceeding was ongoing, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), holding that the Confrontation Clause of the Sixth Amendment requires that a criminal defendant have the opportunity to confront adverse witnesses. Under *Crawford*, testimonial statements from a witness who is unavailable for trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity to cross-examine the witness. *Id.* at 54.

*Crawford* was decided before Ramirez's new postconviction counsel filed a postconviction motion in the circuit court, but postconviction counsel did not raise any argument under *Crawford* or the Confrontation Clause. Postconviction counsel raised several other arguments, including that the trial court erred by admitting the hearsay statements of Cynthia and M.R. based on hearsay exceptions. Dkt. 14-4 at 37–38. The circuit court denied the motion after a hearing, Dkt. 14-4 at 58, and counsel appealed. (The same attorney represented Ramirez in postconviction and appellate proceedings.)

On appeal, counsel repeated the claims raised in the postconviction motion, and raised additional claims regarding hearsay, improper joinder, prosecutorial misconduct, and

sufficiency of the evidence. Dkt. 14-4 at 37–38. But appellate counsel did not argue that M.R.'s or her brother's out-of-court statements failed the confrontation test in *Crawford*, Dkt. 14-4, even though Ramirez wrote two letters to counsel asking her to make a *Crawford* argument. The Wisconsin Court of Appeals affirmed the conviction and the circuit court's order denying postconviction relief. Dkt. 14-7. The Wisconsin Supreme Court denied Ramirez's petition for review. Dkt. 14-10.

Ramirez filed a pro se postconviction motion under Wis. Stat. § 974.06 in the circuit court, arguing that postconviction counsel was ineffective for failing to raise confrontation arguments in his postconviction motion or on appeal. Dkt. 23-2 at 64. Ramirez relied primarily on *Crawford* in arguing that his constitutional right to confront his accusers had been violated. *Id.* at 66. The circuit court denied the motion without an evidentiary hearing in a February 21, 2013 decision and order. Dkt. 23-2 at 18–23. Ramirez appealed, Dkt. 23-2 at 1–16, and the court of appeals affirmed on May 26, 2014. Dkt. 14-19. The court concluded that *Crawford* did not apply to Ramirez's ineffective assistance of counsel claims because it was decided after Ramirez's trial and did not apply retroactively on a motion brought under Wis. Stat. § 974.06. *Id.* The court further concluded that under the law in effect at the time of Ramirez's trial, the hearsay statements did not violate Ramirez's confrontation rights. *Id.* at 3–5. Ramirez filed a petition for review, but the Wisconsin Supreme Court denied it. Dkt. 14-22.

Ramirez filed his habeas petition in this court on November 20, 2014. In a previous order, Dkt. 32, I dismissed three of Ramirez's claims. The only claim remaining is Ramirez's claim that postconviction counsel was ineffective within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to raise Confrontation Clause arguments in a postconviction motion or on direct appeal.

ANALYSIS

Ramirez contends that appellate counsel was ineffective by failing to raise a *Crawford* challenge to the introduction of the out-of-court statements of the M.R, child victim, and her younger brother.[1] Under *Strickland*'s two-pronged standard, Ramirez must show both that his counsel's performance was deficient and that he was prejudiced as a result. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011). To demonstrate deficient performance, Ramirez must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "This means identifying acts or omissions of counsel that could not be the result of professional judgment." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) (internal quotation marks and citations omitted). To demonstrate prejudice, Ramirez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 499 U.S. at 694. The state argues that Ramirez cannot establish that counsel's performance was deficient or that he suffered any prejudice.

## A. Deficient performance

Appellate lawyers are not required to present every nonfrivolous claim on behalf of their clients, but they are expected to "'select[] the most promising issues for review.'" *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (quoting *Jones v. Barnes*, 463 U.S. 745, 753 (1983)). Appellate counsel's performance is deficient if counsel fails to raise a nonfrivolous claim that was both "obvious" and "clearly stronger" than the claim or claims actually presented, unless

---

[1] In Wisconsin, a direct appeal can start with a postconviction motion in the trial court. Wis. Stat. § 809.30(h). The same lawyer represented Ramirez during the postconviction proceedings and in the appellate courts. For simplicity, I will refer to counsel as "appellate counsel" throughout this opinion.

counsel had a strategic reason for withholding an argument. *Id.* When evaluating an attorney's performance, courts must defer to any strategic decision the lawyer made that falls within the "wide range of reasonable professional assistance." *Id.*

In addressing whether the *Crawford* claim was "clearly stronger" than the claims that appellate counsel actually presented, the state does not try to defend the claims that appellate counsel actually raised on appeal, for good reason. Many of appellate counsel's arguments were so weak that they bordered on frivolous. Appellate counsel argued that Ramirez was denied his right to a speedy trial, Dkt. 14-4 at 32, but there was no evidence that Ramirez ever made a formal speedy-trial objection or that delay prejudiced his defense. Dkt. 14-7 at 7. Counsel argued that the trial court erred in joining the 1998 and 1999 claims for trial, Dkt. 14-4 at 41, but counsel's argument was based on the wrong standard of review and counsel failed to identify any prejudice from the joinder. Dkt. 14-7 at 7–8. Counsel raised a sufficiency-of-the-evidence argument, arguing that there was not enough "physical evidence" to convict Ramirez. *Id.* at 29–30. But because this was a sexual assault case involving DNA evidence and conflicting testimony, the argument was doomed to fail. In addition, as the state court of appeals stated, "[p]hysical evidence is not required," and "[t]here was seminal fluid found on the victim." Dkt. 14-7 at 12. Counsel raised several arguments challenging the effectiveness of trial counsel, including that trial counsel failed to hire experts to examine the DNA evidence, failed to refute Dr. Schellpfeffer's testimony, and failed to make a chain-of-custody argument about the DNA evidence. Dkt. 14-4 at 27–28. But counsel had no evidence that there was a chain-of-custody problem or that an expert would have made any difference to the outcome of trial. Dkt. 14-7 at 13–15. Counsel also challenged the admission of a single hearsay statement by Cynthia to her mother, identifying Ramirez as the person who had assaulted M.R., Dkt. 14-4 at 37–39,

even though there were many other more significant out-of-court statements that had been admitted at trial. Finally, counsel raised arguments about prosecutorial misconduct and sentencing, which the court of appeals rejected easily. Dkt. 14-7 at 10, 15.

All of the claims raised by appellate counsel were weak, and the state does not argue otherwise. But the state argues that appellate counsel was not deficient for failing to raise a confrontation claim for two reasons. First, appellate counsel could not raise a confrontation claim on appeal because trial counsel did not preserve the claim at trial. Second, M.R.'s and her brother's out-of-court statements were nontestimonial and did not implicate the Sixth Amendment or *Crawford*; and the law regarding the Confrontation Clause was unsettled at the time of Ramirez's direct appeal, so appellate counsel cannot be faulted for failing to raise the claim. I address each of these arguments below.

### 1. Preservation of confrontation claim

As I explained in November 29, 2018 decision, the rule in *Crawford* should have been applied to Ramirez's case because it was decided before his conviction became final on direct review. Dkt. 32 at 12–13 (citing *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987) ("[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication.")). The Wisconsin Court of Appeals applied federal law unreasonably when it concluded that *Whorton v. Bockting*, 549 U.S. 406 (2007), barred Ramirez's *Crawford* claim.

Now the state argues that even if *Whorton* did not bar Ramirez's *Crawford* claim, Wisconsin procedural rules did. The state argues that in Wisconsin, the retroactivity rule from *Griffith* applies only to cases in which the relevant claim was preserved at trial. And because trial counsel did not object to admission of M.R.'s and her brother's out-of-court statements

on confrontation grounds, the confrontation claim was not preserved. The state cites *Ford v. Georgia*, 498 U.S. 411, 418 (1991), in which the Supreme Court considered whether Georgia's "contemporaneous-objection" rule was an "adequate and independent state procedural ground" for the state court's rejection of a defendant's *Batson* claim. But *Ford* was about the doctrine of "procedural default," which can bar habeas claims, and that doctrine is not applicable here, where no state court concluded that Ramirez's confrontation claim was procedurally barred.

The state also cites cases from the Eleventh Circuit, including *United States v. Verbitskaya*, 406 F.3d 1324, 1340 (11th Cir. 2005), which discusses Eleventh Circuit case law prohibiting a defendant from raising new claims on appeal in a supplemental brief, after briefing is complete. In *Verbitskaya*, the Eleventh Circuit refused to apply the then-recently-decided *Blakely v. Washington*, 542 U.S. 296 (2004), to a case on direct appeal because the defendant had not raised a Sixth Amendment right-to-a-jury claim in his initial brief on appeal. But *Verbitskaya* is based on an Eleventh Circuit rule that is not controlling here. Ramirez's argument is that appellate counsel should have raised a confrontation argument in her postconviction motion and on appeal, not that she should have included the claim in a supplemental brief after briefing was complete.

Finally, the state argues that, like Georgia and the Eleventh Circuit, Wisconsin has limited *Griffith* and the retroactivity of new rules announced by the Supreme Court. The state argues that in *State v. Stuart*, 2005 WI 47, 279 Wis. 2d 659, 695 N.W.2d 259, a case involving a *Crawford* challenge, the Wisconsin Supreme Court established a rule that a defendant must have preserved a confrontation claim in the trial court to benefit from the new rule in *Crawford* on direct review. The state bases this argument on the statement in *Stuart* that, "Stuart is the

beneficiary of this change in the law because he properly preserved the confrontation issue and his case is still on direct appeal." *Id.* at ¶ 27.

But the state's argument is not persuasive. Although the Wisconsin Supreme Court mentioned that the defendant in *Stuart* had raised a confrontation argument at trial, the decision does not create a rule barring a defendant who did not raise a confrontation argument at trial from raising a *Crawford* argument on appeal. Instead, as Ramirez argues, the Court was likely referring to Wisconsin's forfeiture doctrine, under which "some rights are forfeited when they are not claimed at trial." *State v. Ndina*, 2009 WI 21, ¶ 30, 315 Wis. 2d 653, 670, 761 N.W.2d 612, 620. *See State v. Wilson*, 2017 WI 63, n.7, 376 Wis. 2d 92, 112, 896 N.W.2d 682, 692 ("[I]ssues not raised or considered by the circuit court will not be considered for the first time on appeal.").

If the state is trying to argue that appellate counsel strategically chose not to raise a confrontation claim on appeal because she thought the claim would be barred by Wisconsin's forfeiture doctrine, that argument is unpersuasive for two reasons. First, I need not decide whether Ramirez's confrontation claim would have been successful or whether a forfeiture defense raised by the state on appeal would have barred the claim. Those questions are not before me. The only question before this court is whether appellate counsel abandoned a "nonfrivolous claim that was both 'obvious' and 'clearly stronger' than the claim[s] [s]he actually presented." *See Shaw*, 721 F.3d at 915. If I conclude that appellate counsel was ineffective, Ramirez will either be released from custody, or he will receive a new appeal in which he would have the opportunity to advance the Confrontation Clause arguments that his appellate counsel should have raised. If the state chooses to grant a new appeal, the Wisconsin courts will be free to consider a forfeiture argument. *See id.* at 919 ("Should Indiana choose to

grant [new appeal], instead of releasing Shaw outright, the Indiana courts will be free to consider all pertinent issues of state law at that time.").

Second, even if it is appropriate for me to consider the likely success of a forfeiture defense, I would conclude that the forfeiture defense is weak because trial counsel arguably preserved a confrontation claim for appeal. During trial, trial counsel made several objections to M.R.'s and her brother's out-of-court statements on hearsay grounds, but also referenced "confrontation as to the hearsay," Dkt. 14-26 at 16–17, and cited case law relating to the Confrontation Clause. Dkt. 14-25 at 33–34. Although trial counsel never expressly invoked the Sixth Amendment or the Confrontation Clause, trial counsel's reference to confrontation concerns might have been enough to preserve the confrontation claim for appeal.

Moreover, preclusion based on forfeiture is discretionary in Wisconsin, and a court can "disregard alleged forfeiture and consider the merits of any issue." *Wilson*, 2017 WI 63, n.7. *See also State ex rel. Universal Processing Serv. of Wis., LLC v. Cir. Ct. of Milwaukee Cty.*, 2017 WI 26, ¶ 53, 374 Wis. 2d 26, 892 N.W.2d 267 ("[A] reviewing court may disregard a waiver or forfeiture and address the merits of an unpreserved issue in an appropriate case."). After the Supreme Court issued *Crawford*, the Wisconsin Court of Appeals disregarded forfeiture of confrontation claims in cases that were on direct review. *See, e.g., State v. Searcy*, 2006 WI App 8, n.8, 288 Wis. 2d 804, 832, 709 N.W.2d 497, 509 (rejecting forfeiture argument and stating that defendant "could not have raised at trial a Confrontation Clause claim based on *Crawford*" because his trial preceded the *Crawford* decision); *State v. Savanh*, 2005 WI App 245, n.2, 287 Wis. 2d 876, 883, 707 N.W.2d 549, 552 (same). Therefore, even if the state could raise a forfeiture defense in response to a confrontation claim, the Wisconsin Court of Appeals would likely reject the defense. Accordingly, I conclude that if appellate counsel decided to forgo a

confrontation claim based on potential procedural defenses, the decision was not strategic and amounted to deficient performance. The next question is whether the confrontation claim was so weak or uncertain that appellate counsel's decision to omit it was within the realm of reasonable professional assistance.

### 2. Merits of Ramirez's *Crawford* claim

The Confrontation Clause of the Sixth Amendment states that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, the Supreme Court explained that the Confrontation Clause bars out-of-court statements if they are "testimonial," unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68–69.

In considering any challenge under the Confrontation Clause, a threshold question is whether the out-of-court statement at issue is "testimonial" or "nontestimonial." Statements that are testimonial implicate the Confrontation Clause, but nontestimonial statements do not. *Giles v. California*, 554 U.S. 353, 376 (2008). The Supreme Court has explained that a statement is "testimonial" if the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822–23 (2006). Prior sworn testimony and statements during a police interrogation are testimonial. *Crawford*, 541 U.S. at 68. In contrast, a statement is nontestimonial if the "primary purpose" is to notify police or emergency responders about an ongoing emergency or if the statements are made in the context of requesting help from family, friends, or medical providers. *Id.* So 911 calls seeking police assistance for an ongoing emergency, statements to friends and neighbors, and statements to physicians in the course of receiving treatment will

rarely be testimonial. *See Davis*, 547 U.S. at 822, 828; *Giles*, 554 U.S. at 376; *Michigan v. Bryant*, 562 U.S. 344, 378 (2011). In determining whether a statement is testimonial or not, courts must consider the factual circumstances under which the statements were made. *Davis*, 547 U.S. at 822. Relevant factors include whether an ongoing emergency exists, whether law enforcement is present, and the formality of the situation and the interrogation. *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015). In addition, the Supreme Court has stated that the age of the declarant matters, as "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Id.* at 2182.

At Ramirez's trial, the state presented the following out-of-court statements from M.R. and her brother: (1) M.R.'s statements accusing Ramirez of sexual assault, made to Officer Larsen, Detective Gregory, Nurse Karpowicz-Halpin, and Dr. Siegel; and (2) her brother's statement that he saw Ramirez on top of M.R. on the bed and saw "white boogers" on the bed, made to Detective Gregory. The state argues that postconviction counsel was not deficient for failing to raise a confrontation argument because M.R.'s and her brother's statements were nontestimonial. The state emphasizes that M.R. and her brother are young children and that many of M.R.'s statements were made to medical providers for the primary purpose of obtaining medical treatment.

Statements made by a child about physical or sexual abuse may be testimonial or not, depending on the specific factual circumstances. In *Clark*, the statements at issue were made by a three-year old child to his preschool teachers in response to his teachers' questions about the child's visible injuries. The Supreme Court held that the statements were nontestimonial because the primary purpose of the conversation was not to "gather evidence for Clark's prosecution," but to protect the child. *Id.* at 2181. Because the teachers were unsure who was

abusing the child, their questions to the child were aimed at discovering the abuser's identity and ensuring that the child could be released safely to his guardian at the end of the day. *Id.* The Court considered the situation an "ongoing emergency." *Id.* The Court also noted that the preschool lunchroom setting where the child was questioned did not resemble "the formalized station-house questioning" deemed problematic in previous Confrontation Clause cases. *Id.* The child's age was significant because a three-year old child would not have understood that his statement to a teacher could be used in a criminal case. *Id.* at 2182. Finally, the Court emphasized the identity of the questioner and the stark difference between the relationship of a teacher and student and that of a police officer and citizen. *Id.*

Although the state relies on *Clark* in its opposition brief, the statements at issue in this case are distinguishable from those in *Clark*. At the very least, M.R's and her brother's statements to Officer Larsen and Detective Gregory appear to be testimonial. The statements were not spontaneous and were not made in the context of an ongoing emergency. *See Clark*, 135 S. Ct. at 2181 (emphasizing the "informal and spontaneous" nature of the conversation). At the time M.R. and her brother were interviewed by law enforcement, Ramirez had been arrested on domestic assault charges already. There was no concern that M.R. would be discharged into Ramirez's custody. The interrogations were much more formal than those in *Clark*. M.R.'s and her brother's statements to Officer Larsen and Detective Gregory were made in response to police questioning as part of a sexual assault investigation. The statements were memorialized in police reports and later introduced into evidence at trial. Although M.R. and her brother were children, they were older than the three-year-old child in *Clark*. M.R. was eight years old and her brother was five. They likely understand that by making statements to

police officers who were investigating a crime, their statements could be used in a later criminal prosecution. *See Davis*, 547 U.S. at 823.

It is a closer question whether M.R.'s statements to hospital staff were testimonial. If the primary purpose of M.R.'s statements was to obtain a diagnosis or treatment, her statements were nontestimonial. *See United States v. Barker*, 820 F.3d 167, 171–72 (5th Cir. 2016) (four-year old child's statements to a sexual-assault nurse were nontestimonial because primary purpose of conversation was to medically evaluate and treat the child); *United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005) (admitting statements by two-year-old to doctor, where foster parents took child to pediatrician after noticing marks, there was no forensic interview, and the appointment did not result in referral to law enforcement); *Com. v. DeOliveira*, 447 Mass. 56, 60, 64, 849 N.E.2d 218, 223, 225 (2006) (admitting six-year-old's statements to doctor saying someone put his penis "here, here, and here"; child understood questions to be "medical" and could not anticipate use of statements in prosecution).

Some of M.R.'s statements were for the purpose of obtaining medical treatment. She answered Nurse Karpowicz-Halpin's questions about whether she was hurting and what Ramirez had done to her. On the other hand, some of M.R.'s statements to Nurse Karpowicz-Halpin were not clearly for the purpose of diagnosis or treatment, such as M.R.'s description about where the assault happened, what Ramirez was wearing, and that Ramirez was responsible for her November 1998 injury. *See State v. Arnold*, 2010-Ohio-2742, ¶¶ 34, 38, 126 Ohio St. 3d 290, 300–01, 933 N.E.2d 775, 784 (some statements by four-year-old rape victim to social worker in child advocacy center describing the rape were testimonial, while others were nontestimonial because they were "necessary to diagnose and medically treat" her).

There are other factors that would tend to make some of M.R.'s statements to Nurse Karpowicz-Halpin testimonial. M.R.'s statements were not "spontaneous" or made in the context of an ongoing emergency. Cynthia and M.R. did not go to the hospital of their own volition. Officer Larsen told Cynthia that M.R. needed to be examined at the hospital and he took M.R. there. Officer Larsen arranged for the examination and was present while M.R. made statements to Nurse Karpowicz-Halpin about the incident. Officer Larsen even participated in the examination by asking questions. He left the room while M.R. got undressed, but he waited at the hospital until he received a report from the medical providers who had examined M.R. Officer Larsen's presence and participation during Nurse Karpowicz-Halpin's interview suggest that at least some of the statements was to establish past events potentially relevant to a later prosecution, rather than to provide medical treatment or meet an ongoing emergency. *See Bobadilla v. Carlson*, 575 F.3d 785, 793 (8th Cir. 2009) (child victim's statements to a social worker were testimonial because the interrogation was "initiated by a police officer to obtain statements for use during a criminal investigation"); *Hartsfield v. Com.*, 277 S.W.3d 239, 245 (Ky. 2009) (statements to nurse were testimonial where nurse's questioning involved past events, was not related to an ongoing emergency, and took on the nature of a formal interview); *State v. Hooper*, 145 Idaho 139, 145, 176 P.3d 911, 917 (2007) (videotaped statements by six-year-old victim to nurse and forensic examiner were testimonial, as interview was geared toward gathering evidence, rather than providing treatment).

The state argues that even if there is an argument that the statements should have been excluded, appellate counsel cannot have been expected to raise a confrontation argument because was not "settled" in 2005 that the out-of-court statements at issue here were testimonial. But that is not the right standard when evaluating a claim of deficient performance.

The question is whether the confrontation claim was "nonfrivolous" and "clearly stronger" than the claims appellate counsel did raise. *Shaw*, 721 F.3d at 915–16 (stating that appellate counsel's abandonment of claim could not be excused "on the basis that it would not have appeared promising," where, although the outcome was uncertain, the claim was "genuinely arguable under the governing law" and "had significantly more promise" than the claims that were raised). In this instance, the confrontation claim was "genuinely arguable" and clearly stronger than the claims appellate counsel chose to raise.

In addition, the record shows that Ramirez's *Crawford* claim was "obvious" at the time appellate counsel filed Ramirez's postconviction motion and direct appeal. The Supreme Court decided *Crawford* in 2004, almost exactly one year before counsel filed a postconviction motion and two years before counsel filed her brief in support of Ramirez's direct appeal. Dkt. 14-4 at 44. Ramirez wrote to counsel twice about the *Crawford* decision and urged her to make confrontation arguments. Dkt. 14-16 at 39–41; Dkt. 27-1 at 38–39. The confrontation arguments were not obscure or complicated. *Crawford* stated that the out-of-court testimonial statements cannot be presented at trial unless the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 54. Thoughtful appellate counsel should have been aware of *Crawford* and recognized the propriety of a challenge to the admissibility of the out-of-court statements by Ramirez's accusers.

In sum, the *Crawford* claim was significant and obvious and clearly stronger than the claims appellate counsel did raise. There was no reasonable strategic explanation for counsel's failure to raise the issue on appeal. The next question is whether Ramirez has proved that appellate counsel's failure to raise the *Crawford* argument prejudiced Ramirez.

**B. Prejudice**

To establish prejudice—the other component of the *Strickland* test—Ramirez must show that there is a reasonable possibility that, but for the deficient performance of his attorney, the result of his appeal would have been different. *Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008) (citing *Strickland*, 466 U.S. at 694). *See also Shaw*, 721 F.3d at 918 ("Prejudice exists if counsel bypassed a nonfrivolous argument that, if successful, would have resulted in the vacation of Ramirez's conviction."). The state argues that Ramirez cannot prove prejudice because even without M.R.'s and her brother's out-of-court statements, there was overwhelming evidence of his guilt.

The state's argument clearly fails when applied to the November 1998 charge. M.R.'s statements to Detective Gregory and Nurse Karpowicz-Halpin was the only evidence presented at trial that connected Ramirez to M.R.'s November 1998 injuries. If those statements had been excluded, the state would not have been able to prove counts 1 and 2 stemming from the November 1998 incident.

As for the September 1999 incident, the state argues that if postconviction counsel had raised confrontation errors related to those counts on appeal, there is no reasonable probability that Ramirez would have won an appeal. The state argues that the errors would have been deemed harmless because the evidence of Ramirez's guilty was "overwhelming." Resp. Br., Dkt. 41, at 35. The state points to the following nontestimonial evidence: DNA evidence of Ramirez's semen on M.R., M.R.'s clothing, and toilet paper from the bathroom; testimony that M.R.'s vaginal area was red, irritated, and had an abnormal discharge; Cynthia's out-of-court statements about forcing the locked door open, seeing Ramirez coming out of M.R.'s bedroom while pulling up his shorts, and seeing M.R. in the bathroom with a "look on her face"; and

testimony from law enforcement and hospital staff that Cynthia and M.R. appeared upset that evening.

I agree with the state that the physical evidence against Ramirez, and the DNA evidence in particular, was significant. On the other hand, Cynthia testified at trial that she fabricated the entire sexual assault accusation and coached her children to lie because she was angry at Ramirez. Defense counsel argued that the physical evidence supported Cynthia's changed-story. In particular, the emergency room doctor testified that M.R.'s vaginal redness, irritation, and discharge were consistent with rubbing of that area. As for the DNA, the defense argued that Cynthia planted DNA evidence, which she got from a recently used condom, onto M.R.'s underwear. (The DNA evidence was found in M.R.'s underwear, on toilet paper in the wastebasket, and on the outside of M.R.'s body, but not on the inside of it.) If the jury had not heard the multiple statements from M.R. describing the assault, the jury might have credited the defense's theory that Cynthia had lied about everything, had planted the DNA evidence in her daughter's underwear, and then had told her daughter to wipe herself with toilet paper. The jury showed that they doubted Cynthia's truthfulness by acquitting Ramirez on the charges of battery, false imprisonment, and intentionally causing harm to a child, all of which depended on Cynthia's testimony.

Finally, although both the state and Ramirez focus on whether the outcome of trial would have been different, Ramirez does not have to show that he would have been acquitted to prove prejudice. The relevant question is whether Ramirez "had a reasonable chance of success on appeal but for [appellate counsel's] deficient performance." *Shaw*, 721 F.3d at 919. I conclude that Ramirez has made this showing.

## C. Conclusion

For the reasons set forth above, I conclude that Ramirez's rights to effective assistance of appellate counsel were violated when appellate counsel failed to challenge the admission of M.R.'s and her brother's out-of-court statements under the Confrontation Clause of the Sixth Amendment. The error was not harmless. The decision of the Wisconsin Court of Appeals to the contrary constitutes an unreasonable application of clearly established federal law. Therefore, I will grant Ramirez's petition for relief under 28 U.S.C. § 2254. The state must release Ramirez from custody unless, within 90 days of the date of this decision, the state grants Ramirez a new appeal, with the assistance of appointed counsel, in which he will have the opportunity to advance the argument that his appellate counsel should have raised. *See Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996) ("A defendant whose lawyer does not provide him with effective assistance on direct appeal and who is prejudiced by the deprivation is thus entitled to a new appeal.").

ORDER

IT IS ORDERED that:

1.  Petitioner Antonio G. Ramirez's motion for a writ of habeas corpus under 28 U.S.C. § 2254, Dkt. 1, is GRANTED.

2.  The State of Wisconsin must release Ramirez from custody unless, within 90 days of the date of this decision, the state grants Ramirez a new appeal, with the assistance of appointed counsel, in which he will have the opportunity to advance the Confrontation Clause arguments that his appellate counsel should have raised.

24

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered September 26, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge